May it please the Court, I am Robert Byer and I represent the appellant Toledo Mck I'd like to request three minutes for rebuttal. Granted. This case involves a judgment as a matter of law granted in the face of a mountain of evidence supporting a Sherman Act Section 1 claim. Evidence that exceeded the quantum of evidence that this Court permitted to go to the jury in cases like the Big Apple case, the Arnold Polyak case, the Albert Polk case, the Petruzzi case. The ruling made by the District Court here, notwithstanding a summary judgment decision based on essentially the same evidence that found that Toledo Mck had established sufficient evidence of a continuing conspiracy. Nevertheless, the District Judge in his post-trial opinion explains that the statute of limitations that was being relied on as the basis for precluding the Sherman 1 claim. And in so doing, we believe the District Judge made two fundamental errors. First, the District Judge made the fundamental error of compartmentalizing the evidence, something that this Court warned against in the Big Apple case, among others. And secondly, the Court ignored the case law on the continued conspiracy doctrine. Can we talk for a minute about the Robinson-Pattman Act claim? I mean, I know you've got a lot to say about the Sherman Act, and I've certainly read your briefing on that, but I'm curious about the Robinson-Pattman claim. Yes, Your Honor. You're saying that you get around the Volvo Trucks v. Reeder-Simcoe decision because of footnote 3 in that opinion, because your survey evidence demonstrates or could demonstrate that you were unfairly limited in your ability to compete for bids, if I understand your argument correctly. Yes, Your Honor, that's correct. All right. But your opponent cites the Crossroads Co-Generation Corp case, which you don't respond to in your reply brief, and I'd like you to respond to it now. They say, under the binding precedent of this circuit, there has to be two sales, two contemporaneous sales, and you don't have any evidence of that. What's your response? Our response on the two sales issue is based upon the Supreme Court's opinion in the Corn Products case, which indicated that as long as you have evidence that the disfavored purchaser, in this case the plaintiff, Toledo Mac, was making purchases of the products of like kind and quality over time, that there is no requirement of establishing two sales. This was an issue that was before the Supreme Court and Reeder-Simcoe. If you can point me to a Supreme Court precedent after Crossroads Co-Generation that says what you just said, I'd like that cite. I can't provide you with a Supreme Court case after Crossroads, but what I can provide you with, Your Honor, is the fact that this was a major issue briefed in Reeder-Simcoe. It was argued in Reeder-Simcoe, and the Supreme Court refused to touch it. All right. Well, if the Supreme Court doesn't touch it, then we're bound by a previous panel's decision, right? I mean, you're not disputing that Crossroads says what it says. Well, we think that the Supreme Court precedent in the corn products case is more consistent with the situation involved in this case than was the situation in Crossroads, where we have purchasers in a market where there are bids being placed for products. And part of the problem here, as Mr. Yager testified, is that he's not even getting the bids over time. He's not getting the opportunity. He's being foreclosed from that because of the price discrimination. So what I understand you to be saying is that Reeder-Simcoe, by implication, overrules the express language of Crossroads because the same issue was briefed before them and the Supreme Court didn't address it. Have I understood that line of argument accurately? More accurately, the corn products is still the law because the Supreme Court has never overruled it. Well, corn products doesn't say, does it? Is there something in corn products that says that the following statement from Crossroads is wrong? This is Crossroads. Quote, in order to state a claim under the Robinson-Pavinak, the plaintiff must allege facts to demonstrate that, first, the defendant made at least two contemporary sales of the same commodity at different prices to different purchasers. And then the second one is that it injured competition. But that's a pretty clear statement that there's something you have to have which isn't in this record. What is it in corn products that says that law is wrong? I would refer the Court to pages 743 through 744 of the official opinion in corn products in Volume 324 U.S. where the Court describes that the only thing that is required is that Curtis Company, in that case, the disfavored purchaser, had been a purchaser of the commodity in question. There is no dispute on this record that Toledo Mac was purchasing the product in question and that the products were of like kind and quality as involved in two classes of favored purchasers. First, the bodybuilders, and secondly, the issue with respect to Toledo Mac's own competitors. And we believe that the evidence supports a finding. Certainly, the district judge, in his ruling, based it solely on the Meaders-Zunko case in which he was holding that there was no injury to competition. And that was the determination that the district judge made on summary judgment. I should add that the Robinson-Pavinak, and this is very important, the Robinson-Pavinak claim here was dismissed on summary judgment. We were never given an opportunity to present evidence at trial on that issue because the Court, having originally denied summary judgment on it, then granted summary judgment based solely on Meaders-Zunko on reconsideration. Well, did you have any evidence in the record of contemporaneous sales, two contemporaneous sales? Yes, there was evidence in the record with respect to the purchases that Toledo Mac was making from Mac, both at Mac sales to Toledo Mac and also at Mac sales to its competitors. But were they contemporary, the same exact truck? Head to head. Head to head. There was evidence from which I believe the Court could determine the equivalent of that. That's not argued in the briefing. No, I understand, Your Honor. All right. I understand. Back on the Sherman One issue, with respect to Sherman One, on the continued conspiracy doctrine, there is evidence during the limitations period in this case from 1998 through and including the time of trial with respect to overt acts that were committed by the conspirators in this case. This was a horizontal conspiracy among Toledo Mac's competitors. The evidence shows that the conspiracy was joined by Mac, but that does not change it from being a horizontal conspiracy. The Supreme Court's opinion in Ligon, which was decided after this case, after this case was tried and indeed after the filing of our brief, was based on a situation where there was a pure vertical restraint. The Ligon opinion itself notes there can be horizontal restraints with respect to horizontal agreements with respect to territory and price that should be declared to be unlawful even under a rule of reason analysis. We think that means per se. But in this case, there was plenty of evidence of the horizontal agreement, both direct and circumstantial. During the limitations period alone, there was testimony by a Mac executive, Mr. Lusty, that Mac dealers had gentlemen's agreements not to compete in each other's territories. Mac's director of dealer development told Mac's own consultant that there were these gentlemen's agreements. Mac never took action to disavow them. Instead, Mac enforced them. This was a continuation of what was going on during the period that began in 1986 when two dealers approached Mr. Yeager and told him that they had this agreement, that they aren't going to compete with each other. Well, I understand you to concede that claims prior to the 1991 release are barred by that release and your claims pertain only to the post-1991 activities. What we have asserted on that, Judge Barry, is that we are not claiming damages for the period before 1998. We have argued to the contrary with respect to the release, that the terms of that release do not immunize Mac from future liability based upon a continuation of that conspiracy. It doesn't immunize that conduct. The release itself arguably did not apply to that. It dealt with self-discrimination and not a horizontal combination. When you say on page 16 of your brief, of the reply brief, that the release cannot bar Toledo's claims in this case because those claims pertain to conduct by Mac subsequent to the date of the release, so that you're not restricting it just about damages subsequent, but you're saying here, at least as I read it, and maybe I read it wrong, you're not claiming any conduct. No, we do claim that the conduct is probative, that this was the same conspiracy, that they never stopped it. And the terms of that release, which should have been construed by a jury if that had been an issue, in terms of what the party's intent was, the terms of that release applied only to sales discrimination. It says nothing that we believe would apply to a Sherman Act Section 1 violation. That would be beyond the scope. What's your post-release evidence of a conspiracy? The post-release evidence of a conspiracy is that, first of all, this is a continuation of conduct that had been started by the Dealers' Council, of which Mac had three executives as members. So we have the Dealers' Council promulgating a policy about not selling outside your area. That is reversed by Mac, supposedly. But wasn't that in 89? That was in 89. But Mac continued to adhere to it, even though their stated policy was that dealers could sell anywhere. Mac continued to enforce this. The evidence indicates, again, that Mac was aware that this came from the dealers, that Mac was continuing to adhere to it. Mac was, throughout this period, including the limitations period, refusing to permit assistance to enable out-of-area sales, with the exception of those sales in Mr. Lusty's territory, because Mr. Lusty was not part of the conspiracy. But the evidence in this record, we would suggest, is replete with respect to conduct during the limitations period and before. And the release issue, again, is something that, to the extent that was a defense, that really hasn't been pressed as such in the briefing here. But to the extent that that is a defense, we had a right to have a jury make that determination with respect to what that release covered. That was never done. Thank you. Ms. Mather. Thank you, Your Honor. I'm Barbara Mather. I represent Mac Truck in this proceeding, Mac Trucks. I'd like to address primarily the Sherman Act and the issue that we believe is dispositive under the Sherman Act, which is that the plaintiffs utterly failed to prove a conspiracy during the limitations period, which is after 1998. Doesn't that state the standard incorrectly? Isn't the rule that if they establish a conspiracy was in existence before the limitations period, if there are overt acts that continue within the limitations period, they're good? No. Okay. Then what's the case law that says they're wrong about that? The case law that says they're wrong is both what the courts did in most of the cases they cited and what the courts expressly said in the Iron Ore case, in this circuit, and in the... Let's stick with what they said. Tell me what they said that undercuts the case law quotes that we've gotten from your opponent that say an overt act restarts the statute of limitations. Well, even if we go back to Zenith and the United Shoe case, which they rely upon very heavily, in both of those cases, the court expressly found in Zenith in the earlier case that the conspiracy was continuing, that they were continuing during the limitations period to keep Zenith out. In the United Shoe, that they were refusing to lease machines, which was the gist of the underlying monopolization. Isn't that the argument that your opponents are making? That I don't understand them to be saying there was a conspiracy and then it stopped, and then there were overt acts that related back to a conspiracy that no longer existed. I understand them to be saying there's a continuing conspiracy, and the overt acts show you that there's a continuing conspiracy. But there is no proof, Your Honor, of the continuing conspiracy. Let's talk about what the conspiracy is, and then I'll get to what the cases actually say on the subject. The conspiracy is that MAC combined with its dealers, or joined a horizontal dealer conspiracy. As this court well knows, if MAC had adopted these policies unilaterally, there isn't the slightest possibility that they're unlawful without a showing that wasn't made in this case, anyway. So there has to be a dealer conspiracy in order to have an unlawful conspiracy. And in the Iron Ore case in this district, the Third Circuit said damages must have been caused in the limitations period by an active injurious conspiracy. And they approved the trial court's instructions, which said the plaintiffs have to establish that the conspiracy was still in effect in the limitations period. All right. Well, here's the record that your opponents cite. Now, maybe you've got an issue with the record, but they tell us things like this. I'm just going to pull some stuff quickly from their briefing. Page 15 of their opening brief, 1991 telephone conversation. MAC's vice president, Mr. Flaherty, quote, our policy has not changed, and you know that we, you know, obviously we're looking to protect our distributors, unquote. He tells Yeager, right or wrong, Mr. Gressing says it's a long tradition to protect the dealers from competition. That's interpolating. That protect dealers from competition is their interpolation. But then they say that Mr. Gressing says, quote, it's a longstanding tradition, and he didn't know if he could break it. Yeager and district manager Jack Rusty testified about, according to them, attempts to restrict sales between 89 and 2006. And then they've got a quote from 2002 where Mr. Yeller says, quote, we have to beat the living shit out of him, pardon me, meaning referring to Yeager, he's a son of a bitch, he's just soliciting customers on price. April 2001, Toledo is refused sales assistance. So, and you know, I could keep going, but you know the record far better than me. There's quotes and statements and recordings, et cetera, throughout this period, in which your opponents say, tell you, there's a continuing conspiracy. What, if we were to accept that that's, that the record says what they say it says, how could we, consistent with the obligation in reviewing a Jane Wall, come to the conclusion you've pressed on us, which is there's no evidence of a conspiracy? The thing that makes the conspiracy illegal, your honor, is that it's a horizontal conspiracy among dealers. And there is nothing in that record that you have just read to me. The statements, as opposed to the way they try to spin them, that suggests there is a continuing conspiracy among the dealers. Well, when you say spin, I mean, that's a pejorative word, isn't another word inference? And aren't, isn't Toledo Mac entitled to the inferences in its favor at this stage? The courts of this circuit and the Supreme Court in Monsanto, in Matsushita, the court in this circuit in the InterVest case, which I noticed when I looked, and actually not cited to the panel, for which I apologize, but which is a relatively recent Judge Becker opinion in the Bloomberg situation, all say that when you have conduct which is equally susceptible of unilateral interpretation, or of a conspiracy interpretation, that is not sufficient, unless the conduct or the proof tends to exclude the possibility of conspiracy. And the Legion case says that as well. Well, that's talking about, Legion was talking about actions that the manufacturer takes, as opposed to actions that the distributors take. Here, the assertion is that you've got the dealers directly saying, you've got to enforce this. You've got to stop this guy from competing on policy. So you need to answer Judge Hardiman's question. You said it's spin. The law says they're entitled to inferences. What's your response to they're entitled to inferences? All of Judge Hardiman, all of that evidence that you've cited and that Judge Hardiman referred to, is back in the 80s. All of the evidence of dealer participation, dealer meetings, dealer threats, it's all in the 80s. I thought I had just quoted you. Maybe they've got the record wrong. Maybe they've got the record wrong, but I think I just quoted you things from 2001. You did quote me things from 2001, Judge Jordan, but they are matters that are MAC representations. Mr. Yellis's conversations are Yellis's conversations with Mr. Lusty about what MAC might do. But they refer to longstanding traditions and comments about dealer expectations and dealer traditions, do they not? Not in 1998, Your Honor. I thought I had just read that to you. But the record will say what it says. The Flaherty conversation, for example, Your Honor, which is in a totally different context, but nonetheless is back in 1991, just to take a quick example. Isn't this colloquy that we're engaged in now play right into your adversary's argument that what happened below was a compartmentalization of the evidence contrary to the precedence? Well, but the continuing conspiracy cases, Your Honor, the decision in the Iron Ore case and the decision in the Fifth Circuit case in Thermal, say you must prove that the unlawful conspiracy continues into the limitations period. And in order to prove that the unlawful conspiracy continues into the limitations period, you need a dealer conspiracy. There is no evidence on this record, Your Honors, of a dealer conspiracy in the limitations period. There is a lot of evidence. We claim it's all explained. But for the purposes of this argument, I think you have to take it at face value. There's a lot of evidence about Yellin's conversations with the district manager, Lusty, indicating that they did not like Toledo Mac and they didn't like dealing with it. That is, Mac didn't like it. And there are some indications that Mac delayed sales assistance in certain cases. But those are Mac conduct. That's what's shown in the later period. Your position is there's nothing in that time frame that indicates that this is responsive to what the dealers had previously requested and gotten from Mac, which is this price maintenance agreement. There's no way to read that that way. There is no indication of dealer participation, Your Honor. There is. Let me address one. Let me ask this. Okay. Assume for the sake of discussion that we read the record differently than you do and we thought there may be an inference there that favors a continuing conspiracy and overt act. Would you agree, if that were the state of the record, that it was wrong for the district judge to take this away from the jury, that it should have gone to the jury? I would disagree with the way you've stated it, Your Honor. There is a point at which I think we probably agree, but it's not where you've drawn the line. If there are acts which are capable of either an inference that they're unilateral or that they're conspiratorial, I do not believe that supports the kind of proof of conspiracy that the cases require in the later period. If there is, let's take an example which is kind of an easy one. In the Thurmond case, for example, while the court goes on and says that we demand that the government actually show that there's a conspiracy in the later period, they then rely on evidence of one of the conspirators saying we continue to meet and we continue to conspire in the period. That would be sufficient. Let me read you some things from Monsanto and get your response to that, if I might. This is footnote 11 from Monsanto. And it's talking about a letter that a Monsanto official wrote and then another one was worried about because he thought it would perhaps create misconceptions about Monsanto's marketing policies. And then the Supreme Court said the letter disavowed any intent to enter into an agreement on resale prices. The interpretation of these documents and the testimony surrounding them properly was left for the jury, unquote. Footnote 12, Monsanto argues that the reference could have been made to the complaints by Monsanto employees rather than distributors, suggesting price controls were merely unilateral action, sort of what I hear you arguing here, rather than accession to the demands of the distributors. The choice between two reasonable interpretations of the testimony properly was left for the jury, close quote. Footnote 14, Monsanto's contrary evidence has forced, but we agree with the courts below, that it was insufficient to take the issue from the jury, unquote. Now, I suppose we could keep going, but there's three footnotes from one case where the court seems to be repeatedly emphasizing that if there is a possible contrary interpretation, that that's something that's properly left for the jury. How is the Supreme Court wrong? I don't think the Supreme Court is wrong, Your Honor, but as I recall, the predicate for that was that there were dealer complaints during the period. We don't have that here. We have them back in 1989. Footnote 12 says, Monsanto argues reference could have been made to complaints by Monsanto employees rather than distributors, suggesting price controls were merely unilateral action. That's what I hear you arguing here, that it's just as consistent to say unilateral action as to say conspiracy. The Supreme Court says they've got evidence. Monsanto says that same kind of argument here, but the choice between two reasonable interpretations of testimony probably was left for the jury. Are you asserting that there's no reasonable interpretation that could be given to the evidence that would lead to the conclusion of concerted action as opposed to independent action? If you look at the evidence in 1998 on, Your Honor, there is no basis under Baby Food, under InterVest, under Legion, that you could conclude that you have a dealer conspiracy inference that is supportable from that evidence. Furthermore, Your Honor, the last act of the dealers here, that's actually on the record, was a protest against the original policy that was adopted and a revocation of that policy that followed all the way back in 1989 to restore out-of-AOR sales assistance. The final point I'd like to make on that point is, not only is all of the conduct unilateral in the later period, and I believe under InterVest and under the current Supreme Court cases, one cannot use conduct that is capable of either a conspiratorial or unilateral inference to prove a conspiracy. But in addition to that, as I believe the Court knows, this is a situation where the plaintiff compiled his own records of where he sold in the 1998 period. Eighty-five percent of his sales were out-of-AOR. And he admitted in testimony that his largest customer, Premier, in Cleveland, was a customer where he got out-of-AOR sales support from Mac. The conduct, the actions of the distributor, the absence of any distributor conspiracy evidence in the 1998 period all support the judgment below we ask you to affirm. Thank you. Mr. Byer. Mr. Reynolds, I'd like to talk a little bit about the record on some of this. First of all, with respect to the action on the so-called repeal of that distribution memorandum, we're talking about Bulletin 38-89A. The record is replete. The new bulletin that supposedly repealed the prohibition against out-of-AOR sales is at page 3982. It was Exhibit P675. All that does is say that you can sell out of your area if it was a preexisting customer, but that ban on assistance otherwise out-of-AOR sales is not affected by this document. We have Mac in the period of 1998 through 2005 complaining about Lusty not playing by the rules, continuing to make these sales, that he's out of his area. They're acting contrary to policy. To address Ms. Mather's point, if you would, she says that all the stuff that goes on in that period, Mr. Byer, has to do with Mac comments, and that's independent action, and it doesn't reflect concern. It's just as consistent with independent action, and therefore you don't have evidence of a conspiracy under the antitrust laws. Well, first of all, under Monsanto, that applies. That restriction on inferences applies only where you're dealing with indirect or circumstantial evidence that is ambiguous with respect to the conspiracy. We would suggest that we have plenty, and Your Honor cited part of it, of direct evidence of the existence of this conspiracy. During the limitations period, the evidence would include Mac's own admissions of guilt. We were entitled to that inference in terms of determining whether we could get to the jury. You have Yellis being told, I hope you like federal prison because that's where you're going. He's getting this from another Mac employee. We have Lusty's testimony about knowledge of the, again, that he was aware during this time that there was this gentleman's agreement still in effect from the dealers. That's why Ms. Giuliano, Mac's consultant, was told in 1999 that this gentleman's agreement still is in place. We have Mac again acting contrary to its policy, complaining about Yeager not playing by the rules. If that is not evidence that entitled us to get to the jury on the issue of whether this conspiracy continued throughout and into the limitations period, including the firing of Jack Lusty after he gave his deposition testimony, I don't know what is sufficient to get a case to the jury. The cases where, like InterVest, where evidence was deemed to be insufficient, pale in comparison to this record. Thank you, Your Honor. Thank you. Again, the case is very well argued. We'll take it under advisement.